IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

FILED
2004 APR 19 PM 4:05

THE STATE OF WEST VIRGINIA, by its
Executive Department, consisting of THE
HONORABLE BOB WISE, GOVERNOR;
THE HONORABLE JOE MANCHIN,
SECRETARY OF STATE; THE
HONORABLE GLEN B. GAINER III,
AUDITOR; THE HONORABLE JOHN D.
PERDUE, TREASURER; THE
HONORABLE GUS R. DOUGLASS,
COMMISSIONER OF AGRICULTURE;
and THE HONORABLE DARRELL V.
McGRAW, JR., ATTORNEY GENERAL,

*Plaintiff,*

v.

Civil Action No. 04-C-1015

ROBERT E. GRAHAM, an individual;
COUNCIL ON AGING, INC. (formerly
known as the Wyoming County Council on
Aging), a West Virginia nonprofit
corporation; and ALL CARE HOME &
COMMUNITY SERVICES, INC., a West
Virginia nonprofit corporation,

*Defendants.*

---

## COMPLAINT FOR INJUNCTION, WRIT OF QUO WARRANTO, AND ANCILLARY RELIEF

---

### INTRODUCTION AND SUMMARY

Now comes the State of West Virginia, by its Executive Department, herein legally

represented by Francis A. Hughes, Chief Deputy Attorney General, William S. Steele,



Managing Deputy Attorney General, and Silas B. Taylor, Senior Deputy Attorney General. Plaintiff herein petitions this Honorable Court to require the defendants to show cause why they should not be enjoined from exceeding or abusing the corporate powers conferred upon them by law, and why they should not be enjoined from purporting to exercise powers that are not granted by, or are in conflict with, the laws of West Virginia and the charters and bylaws of the defendant corporations. Specifically, Plaintiff respectfully requests that this Court permit such inquiry and enter such orders as will enable the Court to determine whether defendant Graham has misappropriated, or otherwise improperly used, the resources of the corporate defendants for his personal enrichment and other unauthorized purposes and, if so, to grant such relief as may be necessary to recoup such resources and to ensure that the resources of the defendant corporations are hereafter devoted exclusively to the charitable purposes for which they were formed -- serving senior citizens and the disabled.

Pending final resolution of this proceeding, Plaintiff requests such relief as may be needed to preserve and enhance the corporate defendants' ability to continue serving their charitable purposes. Specifically, Plaintiffs ask this Court to appoint a receiver or court monitor for that purpose; to grant temporary injunctive relief to preserve and maintain the assets and records of the defendants; and to require a complete financial accounting of the defendants sufficient to determine whether and to what extent defendant Graham has been unjustly enriched with funds that should be returned by him and devoted to enhancing services to senior citizens and the disabled.

For reasons appearing hereafter, no monetary relief is sought against the individual members of the Board of Directors of either corporation.

For its Complaint, Plaintiff alleges as follows:

## I.

## PARTIES

1.  The State of West Virginia is the Plaintiff herein and appears by its Executive Department, consisting of the Governor, Auditor, Treasurer, Secretary of State, Commissioner of Agriculture, and Attorney General. The State's legal representative is the Honorable Darrell V. McGraw, Jr., Attorney General. As the State's legal representative, the Attorney General is authorized by West Virginia Code §§ 53-2-1, 31E-3-304 and 31E-13-1330 to bring this action on behalf of the Plaintiff.

2.  Defendant Robert E. Graham is the "Executive Director" of both of the corporate defendants, and has held that position with both corporations for all times relevant hereto.

3.  The corporate defendants are West Virginia domestic nonprofit corporations, both of which have applied for and received tax-exempt treatment as charitable organizations, both of which maintain their principal office at Route 10, "Old Itmann Schoolhouse," located in Itmann, Wyoming County, West Virginia.

## II.

## JURISDICTION AND VENUE

4. Jurisdiction and venue are vested in the Circuit Court of Kanawha County, West Virginia, by the provisions of West Virginia Code §§ 53-2-2 and 31E-1-140.

## III.

## FACTUAL BACKGROUND

### *Description of Defendants*

5. The corporate defendants have both been authorized pursuant to Chapter 31E (and its predecessors) of the West Virginia Code to exercise corporate power solely for nonprofit charitable purposes, and accordingly claim tax-exempt status under 26 U.S.C. § 501(c)(3) and parallel provisions of the West Virginia Tax Code. Both are prohibited by law and by their articles of incorporation or by-laws from issuing stock or making distributions of earnings or assets that inure to the benefit of any director, officer, or private individual. (*See,* W. Va. Code §§ 31E-1-150(8) and (17), and § 31E-2-202.) However, said corporations are permitted by law to pay reasonable compensation to officers, and to reimburse their reasonable expenses.

6. Council on Aging, Inc. (hereafter "Council on Aging"), operates two senior centers in Wyoming County, West Virginia, at Itmann and Elk Lick (Clear Fork). It receives funding from State and federal grants to provide social services and other services to seniors related to transportation, nutrition, employment, health, and counseling. It also receives fees

from State and federal Medicaid funds to provide in-home care to eligible seniors and the disabled.

7. All Care Home and Community Services, Inc. (hereafter "All Care"), receives fees from State and federal Medicaid funds to provide case management services for the "Title XIX Medicaid Waiver Program" ( home and community-based care for the aged and disabled).

8. During all times relevant hereto, defendant Robert E. Graham has been employed as Executive Director of both corporate defendants. Both corporate defendants also have the same persons serving as their respective boards of directors, and share the same administrative staff. Both corporations maintain their principal offices and administrative staff at the Itmann senior center. In addition, one or both corporations also have office locations in Welch, Princeton, and Charleston, West Virginia.

9. Since April of 2002, the administrative salaries and office rental expenses attributable to All Care's activities have been assumed and paid for by Council on Aging. On information and belief, both corporations refer potential clients to one another and receive Medicaid funding to provide them with in-home care. Significantly, however, unlike the Council on Aging, All Care receives no State grants, and is thus not subject to the same reporting and disclosure requirements as the Council on Aging.

*Grounds to Inquire as to Whether Defendant Graham Has Received*

*Excess Compensation*

10. In March of 2004, the West Virginia Bureau of Senior Services ("BoSS") conducted an investigation into allegations that Defendant Robert E. Graham was receiving excessive compensation as Executive Director of the corporate defendants. The report subsequently issued by BoSS indicated that Mr. Graham had received, in the fiscal year ending September 30, 2003, earnings of $457,872.28 from the Council on Aging, consisting of $185,000 base pay, $44,180 in overtime pay, an annual bonus of $34,000, cashed in annual leave of $34,598, and cashed in sick leave of $160,093.

11. On March 5, 2004, a few days before the investigation began, Mr. Graham additionally received checks from Council on Aging totaling more than $64,000.00 to "cash out" 720 hours of unused annual leave. (Subsequently, however, checks representing 272 such hours were apparently returned.)

12. In their annual returns (form 990) filed with the United States Internal Revenue Service, the corporate defendants have reported paying Mr. Graham salary and benefits totaling approximately over $1 Million for the four year period ending September 30, 2002. These payments are detailed below:

| | GRAHAM SALARY & BENEFITS | | |
|---|---|---|---|
| Year ending 9/30 | Salary | Benefits | Total |
| **1999** | | | |
| Council on Aging | $102,684.00 | $15,045.00 | $117,729.00 |
| All Care | $50,077.00 | $8,225.00 | $58,302.00 |
| Annual Total | $152,761.00 | $23,270.00 | $176,031.00 |
| **2000** | | | |
| Council on Aging | $107,812.00 | $16,172.00 | $123,984.00 |
| All Care | $97,230.00 | $14,584.00 | $111,814.00 |
| Annual Total | $205,042.00 | $30,756.00 | $235,798.00 |
| **2001** | | | |
| Council on Aging | $153,067.00 | $22,960.00 | $176,027.00 |
| All Care | $64,108.00 | $9,616.00 | $73,724.00 |
| Annual Total | $217,175.00 | $32,576.00 | $249,751.00 |
| **2002** | | | |
| Council on Aging | $261,674.00 | $39,251.00 | $300,924.00 |
| All Care | $40,055.00 | $6,008.00 | $46,063.00 |
| Annual Total | $301,728.00 | $45,259.00 | $346,987.00 |
| **Total 1999-2002** | $876,705.00 | $131,861.00 | $1,008,567.00 |

13. The compensation paid to Mr. Graham in 2003 was pursuant to an amended employment contract executed in March of 2002, to last for a term of 20 years, extendable for up to five additional years by Mr. Graham, and terminable only by "mutual agreement." (Attached as Exhibit 1.) It provided for base pay of $185,000.00 per year and additionally provided to Mr. Graham:

    a.    54 days per year of paid vacation and three days of paid "personal leave," either of which could be accumulated by the employee or exchanged for cash;

    b.    24 days per year of paid sick leave, which could be used for illness or accumulated and cashed in at contract termination;

    c.    18 paid holidays;

d.  Additional compensation for time worked in excess of 40 hours per week at 1½ times regular pay;

e.  Employer-funded retirement contributions equal to 15% of Mr. Graham's "gross wages" to be paid into his IRA;

f.  Employer-funded health insurance, supplemental health insurance, disability insurance, intensive care and cancer insurance, dental and eye care coverage, and two life insurance policies;

g.  Annual Christmas bonuses, the amount of which is to "be prescribed by the Board of Directors" (but is in practice determined by Mr. Graham as a recommendation to the Board);

h.  A new "company vehicle of the employee's choosing" to be replaced every three years; and

i.  Two expense-paid out-of-state trips each year of the employee's choice.

14.  There was no indication in the information made available to the BoSS investigators suggesting that the Board relied upon any study, survey, report, or other objective information in approving the aforesaid compensation package. On information and belief, and as reflected in news coverage of Mr. Graham, the total compensation thus paid to Mr. Graham was widely perceived as excessive in relation to the compensation typically paid to executives of similarly situated charitable organizations in West Virginia and was likewise perceived as in excess of the reasonable value of Mr. Graham's services.

15.  Shortly after the BoSS investigation had commenced, Mr. Graham recommended to the Board of Directors for the Council on Aging that his salary and benefits be reduced prospectively. At the Director's meeting of March 10, 2004, the Board issued a resolution

8

(Attached as Exhibit 2) authorizing its President, "*with the mutual agreement of Robert E. Graham,* to . . . offer Mr. Graham continued employment as the Executive Director of the Council on Aging, Inc., under the following terms and conditions:" (Emphasis supplied.) Those terms and conditions included a reduced yearly salary of $99,000 and provided a) that "there will be no current contract of employment;" b) that either party could terminate his employment on 30 days notice; c) that sick leave, holidays, and vacation be in accordance with the policies and procedures of the Council on Aging; and d) that defendant Graham "repay in full all sick leave cashed out and paid to him in the year 2003." Subsequent to the BoSS investigation, it was represented to BoSS that on March 31, 2004, the sick leave was "repaid" resulting in 1,900 hours of sick leave being restored to Mr. Graham's accumulated leave account.

*Grounds to Inquire as to Whether Defendant Graham has Abused or Wasted*

*Funding Provided to the Corporate Defendants by Taxpayers*

16.     The BoSS investigation, while not an exhaustive audit of the corporate defendants, uncovered numerous examples of expenditures that appear to have been unrelated to the corporations' authorized charitable purposes, or that were excessive and wasteful in relation to their purpose, including, but not limited to, the following examples:

17. The BoSS investigation concluded that Mr. Graham claimed in addition to his regular salary, and was paid, 330 hours of overtime in 2003 at the rate of $133.41 per hour, for performing tasks which clearly could have been performed for less by other employees

or contractors, which were not verifiable by other employees, and which were otherwise questionable or excessive, including:

   a.   16 hours to clean his office on Christmas, 2003, and the day following ($2,135);

   b.   25 hours at a Las Vegas Conference (in addition to his regular salary) and "getting caught up" ($3,335);

   c.   19 hours to "check on floor sealing" ($2,535);

   d.   16 hours "parking lot sealing" ($2,135);

   e.   5 hours to "take printer to Princeton" ($667); and

   f.   6 hours "picking up supplies" ($800);

18.   Other apparent abuses of overtime noted in the BoSS report included:

   a.   16 hours for senior trip to the Biltmore, plus received regular salary while on trip ($2,134);

   b.   5 hours on trip to Pigeon Forge, late return, work on time sheets, plus paid normal salary while on trip ($667) and

   c.   4 hours to "pick up supplies" ($534).

19.   The corporate defendants are not required by State and federal labor laws to pay overtime compensation to administrators such as Mr. Graham. On information and belief, similarly situated executive administrators do not receive overtime compensation, but rather are limited to their salary.

20.   The liberal terms of Mr. Graham's employment, including overtime, vacation- and sick-leave, the ability to cash in leave, and all-expense paid travel, together allowed (and

10

allow) Mr. Graham to exercise inappropriate control over the amount of his own compensation.

21. Five days prior to suggesting to the Board of Council on Aging that it reduce his salary, Mr. Graham "cashed out" 720 hours of accumulated vacation at the 2002 contract rate of $89/hour. Had he done the same after his pay was reduced, the rate of compensation would have been about $48/hour. (As hereafter explained, a portion of this transaction has since been reversed.)

22. When All Care was unable to afford to pay Mr. Graham his salary and accumulated leave in 2002 and thereafter, Mr. Graham suggested to the Board of Council on Aging that his employment contract be amended to have such pay and leave, together with that of the other administrative employees, paid for and assumed entirely by the Council on Aging.

23. In 2001 and 2003, Mr. Graham expended corporate funds of the Council on Aging to purchase two Lincoln Navigators, both of which automobiles are still in the agency fleet, and both of which (on information and belief) are used by Mr. Graham, or by Mr. Graham and his son (also an employee), as personal as well as business vehicles. The combined cost of both was over $100,000.00. Insurance, fuel, and maintenance for both vehicles are paid for entirely by the company.

24. Mr. Graham claims to have accumulated over 2,855.5 hours of unused sick-leave, which (according to information available to the BoSS investigators) is between 100

and 300 more hours than could have accumulated by him over his entire 27 years of employment. Under the 2002 contract, such accumulated leave would have a value, upon being cashed in, of about $253,650 and, under the more modest rate of compensation contemplated in the 2004 resolution, about $136,800. (Mr. Graham maintains that company policy precludes the cashing out of sick leave, although that was also true when he in fact cashed out his sick leave.)

25. Mr. Graham, often accompanied by the Agency Coordinator, and sometimes by family members, took numerous expense-paid trips, either with or without senior clients, with little or no apparent business justification. He received full salary while on the trips, without using leave, and also received overtime compensation, a per-diem for food of $50/day, and all lodging and transportation paid. Information about the trips was requested by the BoSS investigation, but the Council on Aging refused to provide documentation of the cost of the trips, nor do they appear to have been knowledgeably approved by the Board of Directors of the Council on Aging (see paragraph 32 herein).

26. The trips included Florida and the Bahamas (including a cruise on an ocean liner), Hawaii, Las Vegas, Pigeon Forge, and Key West, Florida. Following the investigators' inquiries regarding the purpose and cost of the trips, it was represented to the investigators that Mr. Graham had, on March 26, 2004 (16 days after the investigation commenced), reimbursed the Council on Aging for certain costs associated with three of the trips, and charged his time spent on those trips to his annual leave. As part of the

reimbursement, Mr. Graham reportedly voided two checks written to him by the Council on Aging to cash out 272 hours of unused annual leave. However, the information thus far provided remains insufficient to determine whether the corporate defendants have been fully reimbursed for all costs associated with such trips.

27. In the basement of the Itmann senior center is a staff training room and an exercise room equipped with state-of-the-art exercise equipment, more of which was on order at the time of the investigation, though (according to Mr. Graham) seniors did not use the equipment.

28. The upper floors, accessible only by stairs, have a room with pool tables, a handsomely furnished apartment complete with a large screen TV and a tanning bed, and a hot tub. Although Mr. Graham indicated to the investigators that neither he nor any seniors used the apartment, he did admit that his clothing was in the closet. The upstairs also boasts a hot tub accessible only by climbing up additional stairs. Mr. Graham told investigators it was installed for the benefit of a senior, now deceased. It was on and operating, though not in use, at the time of the investigators' visit.

29. By contrast, the Elk Lick senior center was described by the BoSS investigative team as ADA noncompliant, drab and in need of repairs. The restrooms lacked grab-rails and had no stall doors or curtains for privacy, and numerous maintenance problems were noted. Patrons of the facility "complained about their perceptions of being treated differently than the seniors who attended the Itmann program."

13

30. It thus appears that corporate funds were spent generously for the Itmann facility, in large part for the comfort and recreation of its resident staff (including Mr. Graham), at the expense of the seniors attending the Elk Lick center.

*Apparent Exploitation by Graham of the Board of Directors*

31. The BoSS investigation disclosed that, at directors' meetings, Mr. Graham presented the Board of Directors with prepared agenda and perfunctory written recommendations that were uniformly approved without dissent and largely without any apparent meaningful discussion. (See Exhibit 3.)

32. For instance, at each meeting, Mr. Graham would seek "approval" of the calendar of events to take place prior to the next meeting, which calendar would often include perfunctory reference to one of his trips without disclosure of its cost, of whom would be accompanying him at agency expense, or of the purpose of the trips, enabling him to claim that they were "approved" when the calendar was "approved." (Examples of such minutes are appended hereto as Exhibit 3.) Contacts by BoSS personnel with available Board members indicated that the Board members were not well-informed regarding the operation and functions of the Board, and had not received appropriate orientation and training.

33. In November of 2003, at the suggestion of Defendant Graham, the by-laws of both corporate defendants were amended to remove all representation on the Board from public agencies, such that the Board of Directors now consists only of members (patrons)

age 60 and over. Prior to that time as many as five of the members were to have been appointed by public agencies. Other changes to both of the bylaws included:

a. Changing the Secretary's prior duty to "keep and be responsible for all records. . . including the minutes," to "shall review the minutes before mailing."

b. Changing the Treasurer's prior duty to "receive and disburse any funds . . . keep accurate records . . . with assistance from the staff . . . to "shall review the financial statements before mailing to the Board . . . ."

Together, these amendments had the effect of maintaining or enhancing the control exercised by the Executive Director, and reducing the prospect of accountability.

34. Based on the preceding allegations, it is reasonable to infer that the Board of Directors of the corporate defendants has developed a pattern of passively approving Mr. Graham's recommendations without full disclosure by him of the facts material to their decisions and without appreciation by the Board of the consequences of their actions, enabling Mr. Graham to exercise an inappropriate degree of control over the corporations' resources.

### Breach of Legal Duties by the Defendants

35. Defendant Graham, as Executive Director, is under a duty to act in good faith with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner which serves the charitable purposes of the corporate defendants. W.Va. Code §31E-8-843. Said duty requires defendant Graham to make full disclosure of all material facts to the Board of Directors when asking their approval of

15

expenditures which will inure to his personal benefit, or to the benefit of his family. W.Va. Code §31E-8-860.

36. The corporate defendants have a duty not to make distributions of assets or income other than to serve the charitable purposes for which they were formed, namely: providing services to seniors in conformity with their articles of incorporation, bylaws, and the laws of the State of West Virginia. (*See, inter alia*, W. Va. Code §§ 31E-1-150(8) and (17), and 31E-2-202.)

37. As a "local service provider" under the State Older West Virginians Act, the Council on Aging is under a statutory duty to "provide supportive services, nutrition services and senior centers *which shall, within available funding*, meet the identified needs of seniors." W.Va. Code § 16-55-7 (emphasis supplied). To the extent that State grants administered pursuant to said Act were abused, wasted, allocated to or diverted from these purposes, either directly or indirectly, by the defendants, the aforesaid duty was violated.

38. By diverting the resources of the corporate defendants to the enrichment and personal benefit of defendant Graham and other unauthorized purposes, the defendants have breached the aforesaid duties and diminished the ability of said corporations to provide the services to seniors and the disabled for which they were formed.

# IV.

## CLAIMS FOR RELIEF

39. The averments set forth in paragraphs one (1) through (38) are hereby incorporated by reference as if fully set forth herein.

40. Under West Virginia Code § 53-2-1, a petition for a writ of Quo Warranto may be brought on behalf of the State of West Virginia by the Attorney General or other person "against a corporation for a misuse or nonuse of its corporate privileges and franchises, or for the exercise of a privilege or franchise not conferred upon it by law . . . or for a purpose not authorized by law."

41. West Virginia Code § 31E-3-304 authorizes this Court to enjoin the corporate defendants from the conduct of unauthorized affairs and to restrain any person from purporting to have, or exercising, corporate powers not granted. Pursuant to West Virginia Code §§ 31E-13-1331, this Court may "issue injunctions, appoint a receiver or custodian pendente lite with all powers and duties the circuit court directs, take other action required to preserve the corporate assets wherever located, and carry on the activities of the corporation until a full hearing can be held."

42. The conduct of the defendants above-described has resulted in a breach of the public trust conferred upon said corporations when the State and federal governments granted them nonprofit and tax-exempt status, and directed public funds to their use for the purpose of fostering and encouraging their purported charitable purposes.

17

43. The conduct of the defendants above-described has resulted in the unjust enrichment of defendant Graham at the expense of the taxpayers who fund senior programs and the seniors who are entitled to the full benefit of such programs.

## V.

## RELIEF REQUESTED

WHEREFORE, for the foregoing reasons, the Plaintiff respectfully requests that this Honorable Court:

(1) Issue immediate preliminary injunctive relief as follows:

(a) requiring defendant Graham preserve his personal assets and refrain from any liquidation, relocation, or transfers of his property other than as necessary to meet the ordinary expenses of living;

(b) prohibiting defendant Graham from accepting, and the corporate defendants from making, payments to defendant Graham for accrued leave, out-of-state travel or overtime, or any other payment to, or for the benefit of, defendant Graham other than his current base salary; and

(c) requiring all defendants (including corporate officers and employees) to maintain and preserve all their financial records, and to refrain from altering the same in any fashion with respect to transactions and events recorded, or entries made, prior to the institution of this lawsuit, and to accurately record and maintain records sufficient to verify all future transactions.

(2) To the extent found to be necessary, appoint a receiver or court-monitor to monitor the operations of the corporate defendants pending final judgment herein, and to exercise such powers as may reasonably be necessary to ensure the continued delivery and enhancement of services to seniors and the preservation of the corporate defendants' assets for that purpose;

(3) Order a complete and independent accounting of the corporate defendants, and of defendant Graham's personal assets and financial dealings, sufficient to determine the extent to which he may have been excessively compensated and unjustly enriched, and to determine the nature and location of any assets thereby obtained by Graham;

(4) Upon proof of a pattern of abuse of the corporations by Graham, issue final injunctive relief requiring the defendant corporations to remove defendant Graham as Executive Director and to eliminate his authority to act on the corporations' behalf;

(5) Issue final injunctive relief requiring the defendant corporations to implement mechanisms and procedures that will foster accountability for, and efficient use of, the public and private funds provided to said corporations to serve their charitable purposes, including, but not limited to, amendments to the bylaws such that the Board shall include substantial representation appointed by State and area funding agencies;

(6) Declare that the assets of defendant Graham are encumbered by a constructive trust to the extent that he was unjustly enriched, and issue judgment against Graham

requiring him to disgorge any excess compensation or other moneys unjustly obtained and to recompensate the State and/or the corporate defendants;

(7) Require that any moneys thus collected from Graham pursuant to said judgment be expended on the charitable purposes for which the defendant corporations were formed; and

(8) Provide such other relief to which Plaintiff may show itself entitled.

> **THE STATE OF WEST VIRGINIA,**
> **by its Executive Department, consisting of:**
> **THE HONORABLE BOB WISE,**
> **GOVERNOR; THE HONORABLE JOE**
> **MANCHIN, SECRETARY OF STATE;**
> **THE HONORABLE GLEN B. GAINER**
> **III, AUDITOR; THE HONORABLE**
> **JOHN D. PERDUE, TREASURER; THE**
> **HONORABLE GUS R. DOUGLASS,**
> **COMMISSIONER OF AGRICULTURE;**
> **and THE HONORABLE DARRELL V.**
> **McGRAW, JR., ATTORNEY GENERAL,**
>
> *Plaintiff,*
>
> *By Counsel,*

DARRELL V. McGRAW, JR.
ATTORNEY GENERAL


SILAS B. TAYLOR (State Bar No. 3712)
SENIOR DEPUTY ATTORNEY GENERAL
FRANCES ANN HUGHES (State Bar No. 1816)
CHIEF DEPUTY ATTORNEY GENERAL
WILLIAM S. STEELE (State Bar No. 3589)
MANAGING DEPUTY ATTORNEY GENERAL
State Capitol, Room E-26
Charleston, West Virginia 25305
(304) 558-2021

# EMPLOYMENT AGREEMENT
## AMENDED MARCH 28, 2002
### THE AMENDED SECTIONS ARE AFFECTIVE MARCH 28,2002
### BY MUTUAL AGREEMENT OF BOARD OF DIRECTORS OF THE
### COUNCIL ON AGING, INC
### AND ROBERT E. GRAHAM "THE EMPLOYEE"

This Employment Agreement (this "Agreement") is made effective as of December 6, 2001, by and between COUNCIL ON AGING,INC., ("the Employer"), of PO BOX 130, ITMANN, WEST VIRGINIA 24847 and ROBERT E. GRAHAM, ("the Employee"), of PO BOX 1200, PRINCETON, WEST VIRGINIA 24740.

  A. Employer is engaged in the business of The C.O.A. provides services including Older American Act Title III program, Title V senior employment services,Title XIX Homemaker services and Personal Care Services. Many of these programs are State Wide.While others serve particular counties. The base of operations is Itmann in Wyoming County, West Virginia.

  B. Employer desires to have the services of the Employee.

  C. Employee is willing to be employed by Employer.

Therefore, the parties agree as follows:

1. **EMPLOYMENT.** Employee shall provide to Employer the following services: The Employee is the Executive Director of the C.O.A. He is responsible for all operational functions required to maintain the C.O.A. operations including hiring,firing making reports etc. as required by granter agencies and other payers. He as Chief Executive Officer of the Corporation.

2. **BEST EFFORTS OF EMPLOYEE.** Employee agrees to perform faithfully, industriously, and to the best of Employee's ability, experience, and talents, all of the duties that may be required by the express and implicit terms of this Agreement, to the reasonable satisfaction of Employer. Such duties shall be provided at such place(s) as the needs, business, or opportunities of the Employer may require from time to time.



**3. COMPENSATION OF EMPLOYEE.** As compensation for the services provided by Employee under this Agreement, Employer will pay Employee an annual salary of One Hundred Eighty Five Thousand Dollars ( $185,000.) payable in semi-monthly installments on the 1st day and the 15th day of each month. Time above Forty hours per week will be paid on a prorated time and half basis. The Employee shall be authorized to work time over forty hours as needed and be reimbursed for such time on a prorated time and half basis. Upon termination of this Agreement,by mutual agreement on completion of the time frame, payments under this paragraph shall cease; provided, however, that the Employee shall be entitled to payments for periods or partial periods that occurred prior to the date of termination and for which the Employee has not yet been paid. Accrued vacation, sick leave , personal time and other benefits as described in Section 10 will be paid in accordance with state law and the Employer's customary procedures. The Employee shall be eligible for Christmas Bonuses as may be prescribed by the Board of Directors of the Council On Aging, Inc. on a yearly basis.

**4. REIMBURSEMENT FOR EXPENSES IN ACCORDANCE WITH EMPLOYER POLICY.** The Employer will reimburse Employee for "out-of-pocket" expenses in accordance with Employer policies in effect from time to time.The Employer recognizes that due to the nature of the Council On Aging, Inc. activities which include24 hour a day seven days a week required travel and the emergency conditions that often occur when handling clients in their homes that would otherwise be Nursing Home eligible or the frailest Elderly and handicapped, the employer shall provide the employee with a company vehicle of the employees choosing. Such Vehicle shall be replaced every three years.The Employer will authorize and reimburse the Employee a minimum of two out-state trips of the Employees choice each year to be used by the Employee.

**5. RECOMMENDATIONS FOR IMPROVING OPERATIONS.** Employee shall provide Employer with all information, suggestions, and recommendations regarding Employer's business, of which Employee has knowledge, that will be of benefit to Employer.

**6. CONFIDENTIALITY.** Employee recognizes that Employer has and will have information and other vital information (collectively, "Information") which is valuable, special and unique assets of Employer. Employee agrees that the Employee will not divulge, disclose, or communicate in any manner any Confidential Information that could damage the Employer to any third party without the consent of the Employer.

**7. VACATION.** Employee shall be entitled to 54 days per year of paid vacation for each year of employment beginning on the first day of Employee's employment. Such vacation must be taken at a time mutually convenient to Employer and Employee.The Employee can accumulate vacation and may buy it out if unused from time to time.The Employee shall have Three (3) Personal Days in addition to vacation each year which can be used by the employee or accumulated from year to year. All vacation, personnel time and sick time accumulated are to be paid at the termination of this contract if not used.

**8. SICK LEAVE/PERSONAL BUSINESS.** Beginning on the date of employment sometime around May 1975 until the termination of employment, Employee shall be entitled to accrue two days (16hours) per month paid sick leave time. Sick leave may be accumulated from year to year. Sick leave benefits may be converted into cash compensation if used for illnesses or upon the termination of this contract. If Employee is unable to work due sickness or total

disability, and if Employee's unused sick leave is insufficient for such period, Employee's unused vacation and personal time in excess of all sick leave can be applied to such absence. All requests for sick days, vacation days and personal days off shall be made by Employee in accordance with Employer policies in effect at the signing date of this contract.

9.  **HOLIDAYS.** Employee shall be entitled to 18 holidays with pay during each calendar year.

10.  **OTHER BENEFITS.** Employee shall be entitled to insurance benefits, in accordance with the Employer's applicable insurance contract(s) and policies, and applicable state law. These benefits shall include:

-PEIA Group# ████████████ health insurance which is paid for life to all employees and dependents with ████████ over twenty years continuous service who also were eligible for the health insurance coverage their entire employment ████████ time period. The Employees has previously completed the twenty years continuous service. The life insurance $100,000.amount at the beginning of this contract shall be maintained.

- Jefferson Pilot Group ████████ Disability insurance Policy number
- Concord Hertitage life insurance Group and Policy numbers ████████
- IRA paid to Peoples bank at fifteen per cent of gross wages Account number ████████ and or ████████
-AFLAC group/ policy numbers ████████ intensive care and ████████ Cancer insurance
- CONSECO policy number ████ Supplemental Health Insurance
- Company Self insurance Section 125 Dental ($250. each employee and eligible dependents) and Eye Care ($250. each employee and eligible dependents)

All the above Other benefits shall be carried by the employer for the entire lifetime ( until death) of the Employee if the contract is terminated or at the completion date whichever comes first. Employee shall be able to participate in Employer's pension plan (see IRA above this section) in accordance with the plan's terms and the requirements of law. In the event the companies should change name ,ownership or such other changes that may occur from time to time those changes shall become part of this agreement and this agreement and benifits shall continued in effect.

**11. TERM/TERMINATION.** Employee's employment under this Agreement shall be for 20 years, beginning on December 6, 2001. Termination shall be based on mutual agreement of both the Employer and the Employee only. The Employment Contract can renewed by the Employee past December 6,2021 on a year to year basis up to five years (2026). Termination shall be based on mutual agreement of both the Employer and the Employee only.

**12. RETURN OF PROPERTY.** Upon termination of this Agreement, the Employee shall deliver all property (including keys, records, notes, data, memoranda, models, and equipment) that is in the Employee's possession or under the Employee's control which is Employer's property. Such obligation shall be governed by a separate confidentiality or proprietary rights agreement signed by the Employee and Employer.

**13. NOTICES.** All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage paid, addressed as follows:

Employer:

COUNCIL ON AGING,INC.
PO BOX 130
ITMANN, WEST VIRGINIA 24847


Employee:

ROBERT E. GRAHAM
PO BOX 1200
PRINCETON, WEST VIRGINIA 24740

Such addresses may be changed from time to time by either party by providing written notice in the manner set forth above.

**14. ENTIRE AGREEMENT.** This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**15. AMENDMENT.** This Agreement may be modified or amended, if the amendment is made in writing and is signed by both parties.

**16. SEVERABILITY.** If any provisions of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable.

**17. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**18. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of West Virginia.

Employer:
COUNCIL ON AGING, INC.

By: _Maxine Toliver_

Maxine Toliver
President

AGREED TO AND ACCEPTED.

Employee:

By: _____

ROBERT E. GRAHAM

State Of West Virginia,

County of Wyoming, To-Wit:

I, _Mildred S. Rose_ a Notary Public in and for the State and County aforesaid, do hereby certify that _Maxine Toliver_ and _Robert Graham_ whose names are signed to the foregoing writing bearing the date of the _28_ day of March, 2002, has this day acknowledged the same before me in my said County.

Given under my hand this _28_ of March, 2002.
My commission expires. _Jan 14 2008_.
_Mildred S. Rose_ Notary Public



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
MILDRED S. ROSE
HC 59 BOX 11
HERNDON, WV 24726
My Commission Expires

COUNCIL ON AGING
BOARD OF DIRECTORS MEETING
MINUTES
MARCH 10, 2004

The motion was made by Hazel Morgan and seconded by Charlene Vance to go into regular session at 6:56 p.m. March 10, 2004.

Motion was made by Charlene Vance and seconded by Georgia Hatfield to authorize, approve and adopt the attached resolution. Passed unanimously. The resolution was signed by Board president Martha McKinney.

Motion was made by Hazel Lusk to adjourn meeting. Seconded by Edith Shields. Passed unanimously. Meeting was adjourned at 7:20 p.m.

Members Present:
Hazel Morgan
Georgia Hatfield
Charlene Vance
Edith Shields
Bertha Mullens
Martha McKinney
Hazel Lusk


EXHIBIT

*RESOLVED*
## THE BOARD OF DIRECTORS OF
## COUNCIL ON AGING, INC.

**WHEREAS:** The Council on Aging is a 501 C-3 Non-Profit Corporation in West Virginia with all the powers and rights of such corporation; and

**WHEREAS:** A meeting of the Board of Directors of the Council on Aging, Inc. was held on March 10, 2004, in its Itmann office at which a Quorum was present and voting; and

**WHEREAS:** Government agencies of the State of West Virginia have publicly questioned the Employment Agreement between Council on Aging, Inc. and Robert E. Graham, and have begun requesting investigations into the operations of Council on Aging, Inc. and discussed possible legislation which would make such Employment Agreement impossible to fulfill; and

**WHEREAS:** The media has publicly disparaged Council on Aging, Inc. and Robert E. Graham for Mr. Graham's Employment Agreement, his salary and other payments made to him; and

**WHEREAS:** The Directors of the Council on Aging, Inc. are very proud of the success and growth of the Council on Aging, Inc. and believe that Robert E. Graham has worked diligently and on behalf of the Council on Aging, Inc. for over 25 years and has brought success to the Council on Aging, Inc. and regrets that the press has not emphasized said accomplishments; and

**WHEREAS:** The Council on Aging, Inc. was incorporated and formed to promote and encourage the opportunities of senior citizens in Wyoming County and to encourage all state and local agencies and Wyoming County residents to participate and lend assistance to senior citizens of Wyoming County; and

**WHEREAS:** The disparaging and attacking public remarks from the media and government agencies may interfere with Council on Aging, Inc.'s objective of promoting and encouraging opportunities of senior citizens of Wyoming County and encouraging state and local agencies and Wyoming County residents to participate and lend assistance to such senior citizens; and

**WHEREAS:** Robert E. Graham has suggested renegotiating the terms of his employment; and

**WHEREAS:** The Board of Directors of Council on Aging, Inc. have been vested with the management, control and administration of the affairs, property and business of the corporation, therefore,

*Resolved*, That the Board of Directors of the Council on Aging, Inc., hereby authorizes its President, Martha McKinney, with the mutual agreement of Robert E. Graham, to revoke Robert E. Graham's Employment Agreement as amended March 28, 2002, and offer Mr. Graham continued employment as the Executive Director of the Council on Aging, Inc., under the following terms and conditions:

Mr. Graham will be paid a yearly salary of ninety nine thousand dollars ($99,000.00); and

Mr. Graham will receive sick leave, vacation and holidays pursuant to the current policies and procedures of the Council of Aging, Inc.; and

There will be no current contract of employment between Council on Aging, Inc. and Robert E. Graham effective April 1, 2004; and

Robert E. Graham's current employment will be at-will, and may be terminated at any time for any reason by either Mr. Graham or Council on Aging, Inc. with a thirty (30) day notice; and

Mr. Graham will be required to repay in full all sick leave cashed out and paid to him in the year 2003, Mr. Graham will have until April 15th, 2004 to repay this amount which upon repayment said amount will no longer be considered income, the Board of Directors of the Council on Aging, Inc. acknowledges that the intent of the above payment was made because of the employment agreement previously approved by the Board of Directors.

The Board of Directors of the Council on Aging, Inc., Motioned, Seconded and Voted as recorded in the official minutes of the Council on Aging, Inc. The Board has approved and authorized the revocation of Robert E. Graham's Employment Agreement and the offer of continued employment to Mr. Graham with the above terms. Said terms to be effective April 1, 2004.

WYOMING COUNTY COUNCIL ON AGING, INC.

By: *Martha McKinney*

MARTHA MCKINNEY, PRESIDENT

2

Board of Directors
Minutes
September 6, 2001

President, Maxine Tolliver at 10:17 AM, called the Board meeting to order.

The minutes of the Board meeting of May 24, 2001 were approved upon motion made by Hazel Morgan seconded by Joan Flaim, passed unanimously.

Following discussion of the financial reports, Joan Flaim moved, seconded by Georgia Hatfield, to adopt and approve the financial reports as submitted, passed unanimously.

During the audience request portion of the agenda there was a discussion of the Oceana bus rider problems and the reduction in days of service.

Charlene Vance moved, seconded by Bertha Mullins, to approve and adopt the nutrition reports for May, June and July as submitted. Passed unanimously.

There was a report on transportation and flood damage to vehicles. We lost five vans and an expedition in the flood. We have about made arrangements to get them all replaced. National Bus Company has delivered two new Vans. There is another Van from 16-B-2 that should be received in the next few weeks. Also another Van is ordered and a bigger Van order has been placed on hold. A replacement for the expedition is on order. We did repurchase the newest Van back from insurance for $5500. It is a gamble but it only had 1083 miles. The state gave us $90,000 to go with the insurance settlements to replace the Vans. That was great. We are going to have to pay for the first time a 5% tax to get tags and that has been a hold up. Ridership did not increase and the Oceana driver left. There has been a change in the routes to reflect the rider-ship. The board was aware for over a year that there were problems. Hazel Morgan moved seconded by Marie Campbell to approve, adopt and



authorize the transportation report as submitted. Passed unanimously.

The Executive Director reported on COC/Homemaker. Everything seems to be going well. We are continuing to monitor the income and expenses to insure that we maintain a solid program. There continues to be lots of issues with the Provider Tax. I met with Brian Castic Secretary of Tax and Revenue to try to avoid a legal action. The Directors Association will file suit on our behalf. Bertha Mullins moved seconded by Charlene Vance to approve, accept, authorize and adopt the COC/Homemaker report as submitted. Passed unanimously.

The employees of the month for July were in Wyoming County Cheryl Hylton and Mercer County's was Vicky Carter. There were none for June or August. Peggy Miller has been hired as CoC RN. Bill and Carrie Brinkley resigned. We hired. Chrystal Anderson as a part time Social Worker. She started September 4 2001. All staff who worked the first few days after the flood were authorized to buy a couple of outfits and a pair of shoes at our expense. The Executive director was authorized set a getaway as a bonus once the flood work was under control probably in December 2001. Motion made by Charlene Vance seconded by Joan Flaim to authorize, approve and adopt the items in the Personnel report above. Passed unanimously.

There was a Center Report. **Flood loss** **$976,000.** We have been well treated by the state but FEMA has been tough. The Executive Director reported being exhausted with dealing with agencies contractors etc plus keeping everything going. I am requesting the board authorize the Executive Director to act on behalf of the board to get the repairs done. It will take probably six months to get totally back to normal. ( when everything is relatively back to normal I would like board authorization to on a getaway/conference of my choice and take some staff ) . We will reapply for Provider Network grant by October. Everything seems to be going well at Elk Lick. Also everything seems to be going well at Princeton and Welch. The Charleston office has gone through some

growing pains but seems to be ok. Charlene Vance moved seconded by Joan Flaim to authorize, approve and adopt the center reports as submitted. Passed unanimously.

There was nothing new to report concerning Union activities. Our completed audits were reviewed by the board members and executive director. We do not have the time to request audit proposals for next year as a result of the flood. This is to be considered an emergency situation because of the flood and it was recommended to extend Smith Cochran and Hicks contract to include the audit for the period ending September 30 2001. Following a discussion Hazel Morgan moved seconded by Charlene Vance to approve and adopt the audit report as submitted. Passed unanimously.

There was a presentation of future dates as follows:

| Date | Description |
|---|---|
| September 12,13&14 | Core & Steering |
| October 8 | Columbus Day |
| November 12 | Veterans Day |
| November 14,15 &16 | Core and steering |
| November 20 | Tentative date for All County and Board meeting |
| November 22 & 23 | Thanksgiving Holiday |
| Dec. 27, 2001-Jan 9,2002 | Executive Director staff getaway |

Joan Flaim moved seconded by Hazel Morgan to approve the future dates and schedule as presented. Passed unanimously. The Meeting adjourned at 11:14 AM.

**MEMBERS PRESENT**                **ABSENT**
**Maxine Tolliver**
**Hazel Morgan**
**Hazel Lusk**
**Joan Flaim**
**Bertha Mullins (Edith Shields)**
**Charlene Vance**
**Georgia Hatfield (for Herman Adams)**
**Marie Campbell (for Martha McKinney)**

President, Maxine Tolliver, at 10:22 a.m., called the board meeting to order.

The minutes of the board meeting of March 28, 2002, was approved upon motion made by Edith Shields seconded by, Martha McKinney, passed unanimously.

Following discussion of the financial reports, Hazel Morgan moves, seconded by Joan Flaim, to adopt and approve the financial reports as submitted, passed unanimously.

During the audience request portion of the agenda, there was a discussion of the need for a pay raise for Wayne Stewart. The Executive Director explained that all staff got a raise January 1, 2002, and it is difficult to give one staff person a raise and not everyone else.

Joan Flaim moves, seconded by Martha McKinney, to approve and adopt the nutrition reports for March, April, May, and June as submitted, passed unanimously.

Joan Flaim moved, seconded by Martha McKinney to approve, adopt, and authorize the program reports as submitted, passed unanimously.

There was a follow up Legislative report presented by the Executive Director. We got $65,000 in the State Budget Digest. It will be budgeted as follows:

| | | |
|---|---|---|
| a. | Tile in garage | $19,232 |
| b. | Roof repairs | $20,000 |
| c. | Salad Bar & sink (Elk Lick) | $ 5,000 |
| d. | Computer upgrades | $20,768 |
| | Total | $65,000 |

Following discussion of the digest expenditure report, Joan Flaim moves, seconded by Martha McKinney, to authorize and approve all of the financial reports including the legislative report as submitted, passed unanimously.

There is a report on transportation. The C.O.A. is applying for a 16-B-2 van to replace bus number 18. I recommend that the board approve the resolution as submitted. Everything with the buses and service is going well. Hazel Morgan moved, seconded by Charlene Vance, to approve, adopt and authorize the transportation report as submitted, passed unanimously.

The Executive Director reported on COC/Homemaker. Everything is going well. One area of concern is that the State is facing a $187,000,000 deficit in Medicaid. There may be cuts in the future. We are arguing that you cut those persons not in need of service and state waste. Martha McKinney moved, seconded by Joan Flaim to approve, accept, authorize, and adopt the COC/Homemaker report as submitted, passed unanimously.

There was a report by the Executive Director on personnel issues. However, for exception effort, Jennifer Gibson and Jackie Bobbera received $250 bonuses. Ronnie Walker received a $100 bonus for his work at Itmann. Attached is an organizational chart for in-home services. Other recommended personnel actions:

a. Angela Marsh has been hired to do Homemaker RN for the Mullens area.
b. Joni Lusk has been hired to work in the lower end of Wyoming County.
c. Pam Reid has been hired to replace Sherry Beane in Charleston.
d. Melissa Taylor, RN, has been hired on contract for Mercer County and the upper end of McDowell County.

My contract has been amended as per the last board meeting and filed with the minutes. Attorney Bob Kiss is reviewing our organization and contracts to make recommendations to us based on the changing nature of our services. A motion was made by Martha McKinney, seconded by Edith Shields to approve, adopt, and authorize the personnel report as submitted, passed unanimously.

The Executive Director gave a report on the center. The July 8th celebration went well, I would recommend that we do it again next year. There will be a meeting of all our office staff on August 7th at Itmann. There has been a lot of sickness over the past months. Itmann congregate meals have gone up dramatically. That is good. At the Elk Lick center, everything seems to be going well. New dishes were put into service at the center as mentioned at the last board meeting. Everything seems to be going well at the Princeton and Welch offices. The Charleston office has come along fairly well, but a lot of work remains. The Oak Hill office is our fastest rowing office. Keith Thorn has done a good job for us. A motion was made by Edith Shields, seconded by Joan Flaim, to approve, adopt, and authorize the center report as submitted, passed unanimously.

There was nothing new to report concerning Union activities.

The audit came out good with an increase in money and potential for errors. The bid packets are available and we are advertising for the audit for the year-end September 30, 2002. Hazel Morgan moved, seconded by Martha McKinney, to authorize, approve, and adopt the audit and report as submitted.

There was a presentation of future dates as follows:

| Date | Description |
| --- | --- |
| August 26, 27, & 28 | Governor's Summit |
| September 2 | Labor Day Holiday |
| September 11, 12, & 13 | Core and Steering |
| September 24, 25, & 26 | Trip to Barter Theatre |
| October 14 | Columbus Day |
| October 27 | Savings Time |
| November 5 | Election Day |
| November 11 | Veterans Day |
| November 13, 14, & 15 | Core & Steering |
| November 21 | Tentative date for All County and Board meeting |
| November 28 & 29 | Thanksgiving Holidays |
| December 26-January 12,2003 | Hawaii Trip |

Joan Flaim moved, seconded by Hazel Morgan to approve the future dates and schedule as presented, passed unanimously. The meeting adjourned at 11:14 a.m.

| MEMBERS PRESENT | ABSENT |
|---|---|
| Maxine Tolliver | |
| Hazel Morgan | |
| Hazel Lusk | |
| Joan Flaim | |
| Edith Shields | |
| Charlene Vance | |
| Georgia Hatfield | |
| Martha McKinney | |

CHRISTMAS BONUSES
TOTAL COST
2002

| | GROSS BONUS | FICA | FED | STATE | NET BONUS |
|---|---|---|---|---|---|
| OFFICE | 5,078.40 | 388.56 | 825.37 | 214.47 | 3,650.00 |
| WYOMING | 11,731.21 | 897.73 | 1,764.74 | 468.74 | 8,600.00 |
| MERCER | 4,109.94 | 314.64 | 628.20 | 167.10 | 3,000.00 |
| MCDOWELL | 3,427.50 | 262.50 | 525.00 | 140.00 | 2,500.00 |
| RALEIGH | 616.95 | 47.25 | 94.50 | 25.20 | 450.00 |
| KANAWHA | 2673.45 | 204.75 | 409.50 | 109.20 | 1,950.00 |
| TITLE V | 1,439.55 | 110.25 | 220.50 | 109.20 | 1,050.00 |
| | | | | | |
| TOTAL COA | 29,077.00 | 2,225.68 | 4,467.81 | 1,233.91 | 21,200.00 |
| additional $25 | 12,875.00 | 984.94 | 2,625.06 | 515.00 | 8,750.00 |
| | 41,952.00 | 3,210.62 | 7,092.87 | 1,748.91 | 29,950.00 |
| | | | | | |
| TAX | 3,210.62 | | | | |
| | | | | | |
| | 45,162.62 | | | | |
| | | | | | |
| ALLCARE TOTAL COSTS | | | | | |
| | | | | | |
| | GROSS BONUS | FICA | FED | STATE | NET BONUS |
| TOTAL | 545.75 | 41.77 | 82.14 | 21.84 | 400.00 |
| additional $25 | 364.00 | 27.85 | 73.41 | 12.74 | 250.00 |
| | 909.75 | 69.62 | 155.55 | 34.58 | 650.00 |
| | | | | | |
| 941 TAX | 69.62 | | | | |
| | | | | | |
| | 979.37 | | | | |

# COUNCIL ON AGING, INC.

November 18, 2002

TO:         Board Members

FROM:       Robert E. Graham, Executive Director

SUBJECT:    Director's Notes for November 20, 2002

The following are the director's notes for the COA Board meeting of November 20, 2002.

1. <u>Nutrition Reports</u> - I recommend approval of the nutrition reports for July, August, September, and October as submitted.

2. <u>Program/Financial Reports</u>- I recommend approval as submitted.

3. <u>16-B-2/Section 18</u> - The C.O.A. has applied for a 16-B-2 Van to replace bus number 18. Everything with the buses and service is going well. We have started non-emergency medical transport services in the Mullens area. FEMA has sold us four campers ($500 each) that can be used in emergencies. I recommend approval of, adoption of, and authorization for the items listed in the report as submitted.

4. <u>C.O.C. \Homemaker</u> - Everything is going well. One area of concern is that the State is facing an $187,000,000 deficit in Medicaid. There may be cuts in the future. However, the legislature appropriated funds to keep Medicaid intact until July 2003. We continue to argue that you cut those people not in need of service and state waste. There will be a new manual in place in February 2003. I recommend that the Board authorize,

approve, and adopt the report as submitted.

5. **Personnel** – There were no employees of the month since the last board meeting. However, for exceptional effort, Wayne Stewart received a $250 bonus. I am requesting to continue the Christmas bonus policy with revisions for next year. Further, I would like to increase the bonuses by $25.00 per worker not already paid or receiving in excess of $250.00 for the year ending 12-31-2002. Other recommended personnel actions:

    a. Brandon Boyles was hired 8/12/02 as grants writer. He has since moved into the Title V and Human Resource Director's position. That had been Linda Lafferty's position. She is now the director of a day care center in McDowell County.

    b. Keith Thorn has moved from the Oak Hill office to the director's position in the Charleston office.

    c. Larry Reed has been hired to manage our computer systems at $10 per hour. He has a degree in computer science from Bluefield State.

    d. Two Title V workers have been hired: Ester Ellis and Shirley Green.

    e. Pamela Helton 9/23/02 RN Wyoming County, Melissa Pettrey 9/23/02 (has quit) RN Raleigh County, Carolyn Phillips 9/23/02 RN Mercer County, Linda Wright RN Kanawha County, Michelle Mathis RN Raleigh County have all been hired on contract.

    f. On average, we are going over 400 workers per pay period.

I recommend Board action to authorize, approve and adopt the items in the Personnel report above.

6. <u>Center Reports:</u>
The biggest thing to report is that Larry Reed and Technology Solution have made big strides in putting our system on line. We now have a dedicated line in all offices except for Elk Lick. Elk Lick will be up soon. We have a T-1 line to Charleston. Hopefully

in another month, we will have our system integrated to where we will have instant secure connections. Oak Hill, Welch, and Charleston are getting new work stations.

   a. Itmann-The UMWA is running several programs through here. We have used Digest funds to paint the windows and for computer updates. We are waiting for Ray Webb to do the tile work and the roof repairs will wait till spring. People seem to enjoy the increased activities at the center, especially the bean auctions.

   b. Elk Lick - Everything seems to be going well. They now have a salad bar. The center looks good and they have more help than at Itmann.

   c. Princeton- Everything seems to be going well.

   d. Welch- Everything is going well.

   e. Charleston. Has come along fairly well.

   f. Oak Hill- Everything is going well.

I recommend Board action to authorize, approve, and adopt the items requested and the center report as submitted.

7. **Union Activities** - We have nothing new to report, except Logan County (Pride) is now unionized.

8. **Audit** -The new Auditor will begin work this week on the audit for the year-end September 30, 2002. I recommend Board action to authorize, approve, and adopt the Audit and report as submitted.

9. **Future Dates**

| | |
|---|---|
| November 20, 21 & 22 | Core & Steering |
| November 28 & 29 | Thanksgiving Holidays |
| December 24 & 25 | Christmas Holidays |
| December 27-January 9, 2003 | Hawaii Trip |
| Dec. 31-Jan. 1, 2003 | New years Holidays |
| January 8, 2003 | Legislative Session |

| | |
|---|---|
| | begins |
| January 20, 2003 | Martin Luther King Day |
| February 6 | Wyoming County Legislative Day |
| February 10, 11, &12 | Legislative meetings and statewide Senior Day on the 11th |
| February 12 | Lincoln's Birthday |
| February 17 | Washington Birthday Holiday |
| March 27, 2003 | Tentative date for All County and Board meeting |

I recommend Board action to authorize, approve, and adopt the items contained in the future date report as submitted.